1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

NORTHERN DISTRICT OF CALIFORNIA

9
10

ARROW ELECTRONICS, INC.,

11

Plaintiff,

12

v.

13

QUANTUM CORPORATION,

14

Defendant.

15
16

Case No. 23-cv-03746-NC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Re: ECF 57, 81

17
18
19
20
21

This case arises from a contract dispute between Plaintiff Arrow Electronics, Inc. and Defendant Quantum Corporation. Arrow alleges Quantum breached their supply agreement, consisting of a Master Agreement and Addendum, when Quantum failed to issue purchase orders to pay for aged inventory. It also alleges that in doing so, Quantum additionally breached its implied covenant of good faith and dealing.

22
23
24
25
26
27
28

Before the Court are Quantum's motion for partial summary judgment and Arrow's motion for summary judgment. Quantum requests partial summary judgment that (1) the Court cannot consider extrinsic evidence for purposes of interpreting Arrow's form agreements unless Arrow identifies specific provisions in the agreements it drafted that it contends are ambiguous; (2) forecasts submitted by Quantum do not constitute or create binding purchasing obligation on the part of Quantum; (3) forecasts submitted before June

*United States District Court*
*Northern District of California*

4, 2021, were not governed by the Addendum; (4) Arrow was required to satisfy its obligation to provide inventory reports as a condition precedent and take receipt and have physical custody in its warehouse of the parts at issue for at least 60 days before it had the right to request purchase orders from Quantum under the Addendum; and (5) Arrow's Second Claim for Breach of Implied Covenant of Good Faith and Fair Dealing is redundant of, and subsumed by, Arrow's First Claim for Relief for Breach of Contract. Arrow requests summary judgment that Quantum breached the parties' contract and Arrow is damaged in the amount of $4,029,413.20, or alternatively, $3,719,807.21, as well as reasonable attorneys' fees, costs, and interest.

The Court, for the reasons below, GRANTS in part Quantum's motion for partial summary judgment as to finding that (3) the forecasts submitted before June 4, 2021, were not governed by the Addendum; (4)(b) Arrow was required to take receipt and have physical custody in its warehouse of the parts at issue for at least 60 days before it had the right to request purchase orders from Quantum under the Addendum; and (5) Arrow's Second Claim for Breach of Implied Covenant of Good Faith and Fair Dealing is redundant of, and subsumed by, Arrow's First Claim for Relief for Breach of Contract, and DENIES in part Quantum's motion for partial summary judgment as to finding that (1) the Court cannot consider extrinsic evidence for purposes of interpreting Arrow's form agreements unless Arrow identifies specific provisions in the agreements it drafted that it contends are ambiguous; (2) forecasts submitted by Quantum do not constitute or create binding purchasing obligation on the part of Quantum; and (4)(a) Arrow was required to satisfy its obligation to provide inventory reports as a condition precedent before it had the right to request purchase orders from Quantum under the Addendum. Additionally, the Court DENIES Arrow's motion for summary judgment that Quantum breached the parties' contract and Arrow is damaged in the amount of $4,029,413.20, or alternatively, $3,719,807.21, as well as reasonable attorneys' fees, costs, and interest.

United States District Court
Northern District of California

# I.     BACKGROUND

## A.     Factual Findings

### 1.     Master Agreement and Addendum

On September 30, 2020, Arrow and Quantum entered into a Master Agreement through which Quantum would provide written forecasts of its demand for products, and Arrow would procure and supply the inventory.  ECF 1-1 (Master Agreement).

On May 12, 2021, Quantum signed an Addendum to the Master Agreement.  ECF 1-2 (Addendum).  Arrow signed the Addendum on June 4, 2021.  *Id.*  There is dispute as to when the Addendum became effective.

The Master Agreement and Addendum (the Agreements) govern the relationship between the parties.  ECF 1 ¶ 21.  If there is conflict between the terms of the Agreements, the Addendum governs.  Master Agreement at 6; Addendum at 1.  The Parties agree that both contracts are controlled by New York law and are unambiguous.  ECF 1 ¶ 42; ECF 61 at 6.  The Parties disagree as to what the Agreements require Arrow and Quantum to do.

### 2.     Party Actions

On May 26, 2021, Arrow representative Kristin Goff told Quantum representative Patricia Timmons that the products Quantum wished to purchase had a lead time between 12 to 16 weeks.  ECF 54-5 (Goff Decl.), Ex. 9 at 1.  Goff also stated that Arrow "should be booking hard orders now for all demand through 9/30/21," which was 18 weeks from May 26, 2021.  *Id.*  Quantum alleges that the 12- to 16- week lead time was based on an April 29, 2021, email from John Lauritano, a manufacturer representative, suggesting that Arrow "[t]ell Quantum lead time has stretched to 16 weeks if needed to get their attention."  ECF 62 at 6; ECF 83 (Hammon Decl.), Ex. G at 2.  Arrow alleges that these lead times were a result of Arrow learning in April and May 2021 that lead times had climbed from 12 weeks in early 2021 to 16 weeks by the middle of the year.  Willis Decl., Ex. 41 at 1; Goff Decl., Ex. 9 at 1.  Around the same time, a sales manager for a third manufacturer, AMD, warned Quantum that lead times were as high as 30 weeks.  Willis Decl., Ex. 42 at 2.

On May 27, 2021, Quantum provided a forecast to Arrow (May Forecast).  Goff

1    Decl., ¶ 5, Ex. 10.  Along with the forecast, Quantum instructed Arrow to "get parts on

2    order so that [Quantum] can have buffer stock at Arrow."  *Id.*  There is dispute as to

3    whether this forecast was subject to the Addendum.

4         Quantum allegedly sent a forecast to Arrow on July 21, 2021 (July Forecast) that

5    was identical to its May Forecast, but there is dispute as to whether it was sent, who it was

6    created by, and thus, whether this was considered a Material Requirement Plan (MRP)

7    under the Addendum.  ECF 64 at 7 n.24; ECF 62 at 9; ECF 66 at 7.

8         Arrow began ordering components starting June 3, 2021, and continued to place

9    orders throughout the summer.  Goff Decl. ¶¶ 6–7, Ex. 11 at 1; ECF 54-4 (Korn Decl.) ¶¶

10   7–9, Exs. 5 and 5-A.  Arrow ordered more than 75% of its units, 15,206 of them, over a

11   three-day period from July 6, 2021, through July 8, 2021.  ECF 67-1 (Wexler Reply Decl.)

12   ¶ 5.  In July 2021, Arrow placed orders for 6,912 units with less than 30 days lead time for

13   12 of the 15 models at issue in the motion.  ECF 83 (Wexler Decl.) ¶ 9.  By September 1,

14   2021, Arrow had ordered about 90% of its 19,333 units.  Korn Decl. ¶ 8.

15        When placing orders during Summer 2021, Arrow used lead times shown in Table 1

16   that took into account the expanding manufacturer lead times, the manufacturers' historical

17   performance against lead times, the tight market amid the pandemic, the direction from

18   Quantum to build up buffer inventory, and the Addendum requirement that Arrow

19   maintain reserved inventory for Quantum.  Korn Decl. ¶¶ 23, 26, Ex. 8.  99-week entries

20   meant that Kioxia could not quote a lead time and would supply components only as they

21   became available, and zero-week entries denoted inadequate information to verify a

22   precise lead time, so Arrow's system planned for a year out by default.  Korn Decl. ¶¶ 28–

23   29.

24

25

26

27

28

**Table 1**

| Week | Jun 1 | Jun 2 | Jun 3 | Jun 4 | Jun 5 | Jul 1 | Jul 2 | Jul 3 | Jul 4 | Aug 1 | Aug 2 | Aug 3 | Aug 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KXG60ZNV256G | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 |
| KXG60ZNV512G | 0 | 0 | 0 | 0 | 0 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 |
| SDFUS51GEB | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 |
| SDFUS53GEB | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 |
| SDFUS55GEB | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 |
| SDFUS81GEB | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 |
| SDFUS83GEB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 99 | 99 |
| SDFUS85GEB | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 |
| HDEBL20GEA51 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| HDEBL20GEB51 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HDEBL21GEA51 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HDEBL22GEA51 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| HDEBL22GEB51 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HDEJN22GEA51 | 0 | 0 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| HDEPN20GEA51 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 |

Quantum's own system for lead times were shown in Table 2, which showed lead times between eight and 34 weeks for Toshiba and supplier allocated status for Kioxia components.  Willis Decl. Ex. 44.

**Table 2**

| | B | C | I | J |
|---|---|---|---|---|
| 1 | | | | |
| 2 | Quoted Part | Quoted Mfr | NCNR Status | Supplier LT |
| 97 | SDFUS83GEB | KIOXIA | NCNR | Supplier allocated |
| 98 | 100-000000048E | AMD | NCNR | 34 |
| 99 | HDEBL21GEA51 | TOSHIBA | NCNR | 24 |
| 100 | HDEBL20GEA51 | TOSHIBA | NCNR | 13 |
| 101 | SDFUS51GEB | KIOXIA | NCNR | Supplier allocated |
| 102 | HDEPN20GEA51 | TOSHIBA | NCNR | 14 |
| 103 | SDFUS85GEB | KIOXIA | NCNR | Supplier allocated |
| 104 | HDEBL22GEA51 | TOSHIBA | NCNR | 13 |
| 105 | HDEJN24GEA51 | TOSHIBA | NCNR | 24 |
| 106 | SDFUS53GEB | KIOXIA | NCNR | Supplier allocated |
| 107 | 100-000000080E | AMD | NCNR | 34 |
| 108 | HDEJN22GEA51 | TOSHIBA | NCNR | 8 |
| 109 | KXG60ZNV512G | KIOXIA | NCNR | Supplier allocated |
| 110 | SDFUS55GEB | KIOXIA | NCNR | Supplier allocated |
| 111 | HDEBL21GEB51 | TOSHIBA | NCNR | 13 |
| 112 | KXG60ZNV256G | KIOXIA | NCNR | Supplier allocated |
| 113 | HDEPN20GEB51 | TOSHIBA | NCNR | 14 |
| 114 | HDEBL20GEB51 | TOSHIBA | NCNR | 13 |
| 115 | HDEBL22GEB51 | TOSHIBA | NCNR | 13 |
| 116 | HDEJN22GEB51 | TOSHIBA | NCNR | 8 |
| 117 | HDEJN24GEB51 | TOSHIBA | NCNR | 34 |

United States District Court
Northern District of California

5

On August 19, 2021, Quantum provided a revised forecast (August Forecast). Hammon Decl. ¶¶ 9–10, Ex. H.  There is dispute as to whether this was an MRP under the Addendum.  The August Forecast revised Quantum's projected purchases to be lower than the May Forecast.  *Id.*

On September 9, 2021, Quantum submitted an updated forecast (September Forecast) that decreased its projected need.  Goff Decl. Ex. 13 at 1–2; Willis Decl. Ex. 40 (Healy Dep.) 115:24–116:8, 129:24–130:6.

Arrow consequently reduced orders, buying only 360 units in September 2021 and 416 units in October 2021.  Korn Decl. ¶ 9.  Arrow also issued requests to Kioxia and Toshiba to cancel or postpone outstanding orders—Kioxia rejected the requests and Toshiba agreed to cancel orders with deliveries scheduled more than a few months out.  Goff Decl. ¶¶ 12–15, Ex. 15–17.

On October 22, 2021, Quantum submitted a revised forecast (October Forecast) that increased demand.  Goff Decl. ¶ 16, Ex. 18 at 1–2.  The October Forecast reinstated the forecast figures for May through September 2021.  *Compare* Goff Decl. Ex. 10, *with* Goff Decl. Ex. 18.  After receiving the October Forecast, Arrow placed orders for 1,056 units of Product.  Wexler Decl., ¶ 7.

On November 3, 2021, Arrow told Quantum that about 2,000 units of the inventory at issue in this case had sat in Arrow's warehouse for more than 60 days, with thousands more approaching the 60-day mark, and asked Quantum to issue purchase orders.  Goff Decl. ¶ 19 & Ex. 20.  In response, Quantum accepted and paid for a portion of that amount, but by mid-December, Quantum's backlog had more than doubled.  Goff Decl. ¶¶ 20–21, Exs. 21–22.  By the end of December 2021, Arrow stopped placing orders based on Quantum's forecasts.  Korn Decl. ¶ 9, Ex. 5 and 5-A.  In total, Arrow purchased 19,333 units of the component types listed in the Complaint between June and December 2021.  Korn Decl. ¶ 7.

Throughout 2022, Arrow sent Quantum repeated demands to purchase the aged inventory.  Willis Decl. Ex. 46–47.  Quantum continued to issue sporadic purchase orders

6

for forecasted parts, but not enough to consume the aged inventory. *See, e.g.,* Willis Decl. Ex. 48. On January 31, 2023, Arrow sent Quantum a final demand to purchase all remaining inventory. Willis Decl. Ex. 49. In the meantime, Arrow attempted to dispose of Quantum's inventory to mitigate its damages by searching its customer database for other potential buyers, posting the inventory for sale on its public website, and using its broker affiliate, Converge, to seek buyers. Willis Decl. Exs. 50, 37 (Sanchez Dep.) 60:21-61:16. Arrow sold aged inventory to Quantum and a handful of third parties. Korn Decl. ¶ 21, Ex. 6.

Arrow presently holds the units listed below in Table 3 for asserted damages of more than $4 million. Korn Decl. Ex. 7; ECF 81 at 9–10. Table 3 includes the current inventory for the 18 components listed in Arrow's Complaint, three of which—AMD's 100-00000048E and 100-00000080E and Toshiba's HDEPN20GEB51—Arrow has since disposed of entirely, reflected as "0" in quantity and price.

### Table 3

| MFR | MPN | Quantum CPN | QTY | Price per Component | Total Price |
|---|---|---|---|---|---|
| Toshiba | HDEJN22GEA51 | 1-07075-02 | 460 | $116.22[51] | **$53,461.20** |
| Toshiba | HDEPN20GEB51 | 1-07080-01 | 0 | $308.22 | **$0** |
| Toshiba | HDEPN20GEA51 | 1-07080-02 | 680 | $209.12[52] | **$142,201.60** |
| Toshiba | HDEBL22GEB51 | 1-07085-01 | 180 | $119.27[53] | **$21,468.60** |
| Toshiba | HDEBL22GEA51 | 1-07085-02 | 2,440 | $112.83[54] | **$275,305.20** |

| MFR | MPN | Quantum CPN | QTY | Price per Component | Total Price |
|---|---|---|---|---|---|
| Toshiba | HDEBL21GEA51 | 1-07086-02 | 2,040 | $143.99[55] | **$293,739.60** |
| Toshiba | HDEBL20GEB51 | 1-07087-01 | 120 | $175.73[56] | **$21,087.60** |
| Toshiba | HDEBL20GEA51 | 1-07087-02 | 2,030 | $166.55[57] | **$338,096.50** |
| Kioxia | SDFUS55GEB | 1-07091-01 | 40 | $513.29[58] | **$20,531.60** |
| Kioxia | SDFUS85GEB | 1-07091-02 | 271 | $504.83[59] | **$136,808.93** |
| Kioxia | SDFUS53GEB | 1-07093-01 | 20 | $1,748.82[60] | **$34,976.40** |
| Kioxia | SDFUS83GEB | 1-07093-02 | 315 | $1,746.33[61] | **$550,093.95** |
| Kioxia | SDFUS51GEB | 1-07094-01 | 76 | $3,277.33[62] | **$249,077.08** |
| Kioxia | SDFUS81GEB | 1-07094-02 | 588 | $3,266.39[63] | **$1,920,637.32** |
| AMD | 100-000000080E | 1-07100-01 | 0 | $500.73 | **$0** |
| AMD | 100-000000048E | 1-07100-03 | 0 | $1,316.29 | **$0** |
| Kioxia | KXG60ZNV512G | 1-07103-01 | 787 | $98.30[64] | **$77,362.10** |
| Kioxia | KXG60ZNV256G | 1-07104-01 | 295 | $60.53[65] | **$17,856.35** |
| **TOTAL** | | | | | **$4,152,704.03** |

### B. Procedural Background

Arrow filed a Complaint against Quantum for breach of contract and breach of implied covenant of good faith and fair dealing on July 27, 2023.  ECF 1.

Arrow brought a Motion for Summary Judgment on October 23, 2024.  ECF 54-2 (re-filed as ECF 81).  Quantum opposed the motion.  ECF 62.  Arrow replied.  ECF 64.

Quantum brought a Cross-Motion for Partial Summary Judgment on October 23, 2024.  ECF 57.  Arrow opposed the motion.  ECF 61.  Quantum replied.  ECF 66.

Quantum also filed a *Daubert* motion to exclude the opinion of Arrow's Expert Witness Bijan Dastmalchi, which the Court granted.  ECF 55 (re-filed as ECF 82); ECF 80.

Both parties have consented to magistrate judge jurisdiction.  ECF 10; ECF 12.

## II.  LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any

8

material fact.  Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  Bald assertions that genuine issues of material fact exist are insufficient.  *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial.  Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).  All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party.  *Tolan*, 572 U.S. 651 (citing *Liberty Lobby*, 477 U.S. at 255).

## III.    DISCUSSION

### A.    Quantum's Motion for Partial Summary Judgment

Quantum seeks partial summary judgment that (1) the Court cannot consider extrinsic evidence for purposes of interpreting Arrow's form agreements unless Arrow identifies specific provisions in the agreements it drafted that it contends are ambiguous; (2) forecasts submitted by Quantum do not constitute or create binding purchasing obligation on the part of Quantum; (3) forecasts submitted before June 4, 2021 were not governed by the Addendum; (4) Arrow was required to satisfy its obligation to provide inventory reports as a condition precedent and take receipt and have physical custody in its warehouse of the parts at issue for at least 60 days before it had the right to request purchase orders from Quantum under the Addendum; and (5) Arrow's Second Claim for Breach of Implied Covenant of Good Faith and Fair Dealing is redundant of, and

1    subsumed by, Arrow's First Claim for Relief for Breach of Contract.  ECF 57 at 2.

2    **1.    Extrinsic Evidence**

3    First, Quantum requests that the Court find that it cannot consider extrinsic

4    evidence for purposes of interpreting the Agreements unless Arrow identifies specific

5    provisions it contends are ambiguous.  ECF 57 at 2.

6    Quantum argues that because the contract is unambiguous, courts cannot consider

7    extrinsic evidence.  ECF 57 at 17.  Arrow counters that its use of the parties' course of

8    performance and trade usage is appropriate to explain and supplement the Agreements

9    under New York Uniform Commercial Code § 2-202.  ECF 61 at 11.

10   N.Y. U.C.C. § 2-202 states that a final, fully integrated contract "may not be

11   contradicted . . . but may be explained or supplemented . . . by course of performance,

12   course of dealing, or usage of trade."  It further "definitely rejects" the rule in New York

13   that such evidence is inadmissible unless the contract is ambiguous.  N.Y. U.C.C. Law § 2-

14   202, official cmt. 1(c).  As such, while it is true that a court generally must determine that a

15   contract is ambiguous before resorting to extrinsic evidence, there is an exception under

16   the U.C.C.  *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, 728 F.

17   Supp. 2d 531, 535 (S.D.N.Y. 2010) (citation omitted).  The determination of a contract's

18   meaning governed by the U.C.C., therefore, is done "in conjunction with evidence about

19   course of dealing, usage of trade, and the parties' course of performance so long as that

20   extrinsic evidence does not contradict the contract's language."  *Id.*

21   The Agreements are governed under U.C.C. because their main objective is the sale

22   of goods—the provisions requiring Arrow to supply parts to accommodate Quantum's

23   forecasts predominate.  *See Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 593

24   (S.D.N.Y 2004) (applying the U.C.C. to a contract where the provisions requiring the

25   plaintiff to supply products to accommodate the defendant's projections predominated).

26   As such, N.Y. U.C.C. § 2-202 applies to the interpretation of these contracts; it is

27   irrelevant whether they are ambiguous or not.  The Court therefore finds that it can

28   consider limited extrinsic evidence under N.Y. U.C.C. § 2-202: evidence of course of

United States District Court
Northern District of California

10

1    performance, course of dealing, or usage of trade that does not contradict, but supplements

2    and explains the Agreements.  *See* N.Y, U.C.C. Law § 2-202, cmt. 1(c).  Indeed, the Court

3    cannot use such extrinsic evidence to "reinterpret language."   ECF 57 at 17 n.2.

4        Accordingly, the Court DENIES summary judgment for Quantum as to barring the

5    Court from looking at extrinsic evidence to interpret the Master Agreement and

6    Addendum.

### 2.    Forecasts as Binding Purchasing Obligations

8        Second, Quantum requests the Court to find that the forecasts submitted by

9    Quantum do not constitute or create binding purchasing obligations for Quantum.  ECF 57

10   at 2.  To support its argument, Quantum points to Sections 1.1, 1.3, and 1.4 of the

11   Addendum, as well as Section 8.15 of the Master Agreement.

### a.    Pipeline Provision

13       Quantum first requests that the Court find that Section 1.1 of the Addendum (the

14   "Pipeline Provision") does not create a binding obligation on either party, including a

15   binding customer obligation on Quantum.  ECF 57 at 19.

16       The Pipeline Provision states that the "Customer will provide Arrow with

17   forecasted demand for Product they intend to purchase.  This MRP will be sent to Arrow in

18   a mutually agreed electronic format.  Based on the MRP, Arrow will create a pipeline of

19   material by placing orders with Product manufacturers."  Addendum at 1.

20       Quantum first argues that as a general matter, the Pipeline Provision does not create

21   a binding obligation on either party because the vagueness of the amounts and times

22   "renders it impossible for Quantum to sustain a lawsuit against Arrow for breach of that

23   provision (and the reverse should be true as well)" and makes it illusory.  ECF 57 at 19–

24   20.  The Court explores each of the party's obligations.

### i.    Arrow's Obligation

26       The Court finds that the Pipeline Provision imposes an obligation on Arrow to order

27   a reasonable amount of orders at a reasonable time based on Quantum's forecasts.

28       On its face, the plain language requires Arrow to "create a pipeline of material

United States District Court
Northern District of California

1    [based on the MRP]" by "placing orders with Product manufacturers." Addendum at 1.

2    The Parties agree that the Pipeline Provision requires Arrow to order components to satisfy

3    Quantum's demand. ECF 57 at 19 (stating that the provision indicates that "Arrow, at

4    some point in time, was to make *some* orders" in connection with a customer's forecasts);

5    ECF 61 at 6–8 (stating that the forecasts obligate Arrow to order components to satisfy

6    Quantum's demands, but not every component forecasted). Quantum argues that despite

7    this, neither party is bound to this obligation because the Pipeline Provision does not

8    specify amounts or times in making the pipeline. ECF 81 at 20.

9        However, just because the Pipeline Provision does not give these details does not

10   mean that it is unenforceable. *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74

11   N.Y.2d 475, 483 (1989) (stating that "at some point virtually every agreement can be said

12   to have a degree of indefiniteness," but "parties . . . should be held to their promises").

13   Agreements are enforceable if there may exist "an objective method for supplying the

14   missing terms." *Cowen & Co., LLC v. Fiserv, Inc.*, 31 N.Y.S.3d 494, 494 (2016).

15   Methods can be found within the agreement itself or by comparison to "an extrinsic event,

16   commercial practice, or trade usage." *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F.

17   Supp. 3d 354, 360 (S.D.N.Y. 2018) (citing *Cobble Hill*, 74 N.Y.2d at 483). "The

18   conclusion that a party's promise should be ignored as meaningless 'is at best a last

19   resort.'" *Cobble Hill*, 74 N.Y.2d at 483 (citation omitted).

20       As such, the Pipeline Provision is enforceable despite the unspecified amount

21   required to create a pipeline of materials. The amount can be determined by a

22   methodology found within the provision itself—it states that the orders to create the

23   pipeline must be "based on the MRP." Addendum at 1. The intent was to have Arrow

24   hinge the amount on Quantum's MRP, providing an objective standard without the need

25   for further expressions by the parties. *See Cobble Hill,* 74 N.Y.2d at 483 (finding that a

26   contract was enforceable when the price was to be determined by a third party in

27   accordance with applicable rules). The reasonableness of the amount procured based on

28

12

the MRP can be determined by commercial practice.[1]

Further, the provision is enforceable despite the unspecified time to create a pipeline. As stated before, the Addendum is governed by the U.C.C. because the sale of goods predominates. *Supra* Section III.A.1. As such, "the U.C.C.'s 'gap filling' provisions supply a 'reasonable time' for shipment or delivery" that allows the provision to still be enforceable. *City Calibration Ctrs. Inc. v. Health Consultants Inc.*, 727 F. Supp. 3d 332, 356 (E.D.N.Y. 2024) (citing N.Y. U.C.C. § 2-309(1)). The Court finds that here, a "reasonable time" can be determined by commercial practice or trade usage, such as through lead times. *See* ECF 81-4 (Willis Decl.) Ex. 40 (Healy Dep.) 85:20–86:17 (stating that generally, a supplier will look at lead times to determine when to order the parts).

### ii.    Quantum's Obligation

The Court finds that the Pipeline Provision obligates Quantum to "provide Arrow with forecasted demand for Product they intend to purchase." Addendum at 1. The Court also finds that to determine if this provision additionally obligates Quantum to purchase products, it must look at the provision in the context of the whole contract.

The plain language in the Pipeline Provision unambiguously provides that Quantum "will" provide Arrow with forecasted demand for Product they intend to purchase, and thus obligates Quantum to do so. Addendum at 1.

By itself, the provision's language "does not impose an obligation on Quantum to purchase anything." ECF 57 at 20. However, "each provision of the contract 'should be considered, not as if isolated from [its] context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Walmart Inc. v. Cap. One, Nat'l Ass'n*, 725 F. Supp. 3d 450, 467 (S.D.N.Y. 2024). Thus, even if "the plain language of the Pipeline provision . . . does not impose an obligation on Quantum to purchase anything,"

---

[1] Quantum alleges that Arrow claims that the Pipeline Provision imposed an obligation on it to buy *all* the products in Quantum's MRP. ECF 57 at 19. While the Court does not see where Arrow alleged this, it finds that the Pipeline Provision requires Arrow only to buy products *based on* the forecasts. Indeed, MRPs are not purchase orders. However, it does not preclude Arrow from doing so, as long as it is reasonably based on the MRP and consistent with commercial practices.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  the Court must look to the entirety of the Agreements to determine as such.  ECF 57 at 20.

2  The Court explores Quantum's obligation to do so in conjunction with other parts of the

3  Addendum and Master Agreement.  Section III.A.2.b–d.

### b.    Reserved Inventory Provision

5  Quantum also argues that Section 1.3 of the Addendum (the "Reserved Inventory

6  Provision") does not support the interpretation that the Pipeline Provision imposes an

7  obligation on Quantum to purchase anything.  ECF 57 at 21.

8  The Reserved Inventory Provision states that "Arrow agrees, except for any Product

9  designated as allocated, to maintain a predetermined amount of reserved inventory

10  exclusively for purchase by Customer.  The amount of inventory to be reserved for each

11  Product will be based on availability of the product, and the Customer's MRP.  The actual

12  quantity reserved for Customer will be adjusted weekly in accordance with the MRP.

13  Arrow may adjust reserved inventory, at its sole discretion."  Addendum at 1.

14  Again, the Parties do not seem to disagree in their interpretations of the Reserved

15  Inventory Provision.  Quantum argues that this provision "means that only *some* of the

16  inventory Arrow procured allegedly in connection with Quantum's forecast was 'reserved'

17  for Quantum."  ECF 57 at 22.  Arrow's interpretation that the provision "obligated Arrow

18  to maintain a predetermined amount of reserved inventory based on Quantum's MRPs and

19  the product availability" does not conflict with Quantum's interpretation.  ECF 1 ¶ 24.

20  The Court finds that the Reserved Inventory Provision plainly obligates Arrow to

21  maintain reserved inventory for Quantum based on the availability of the product and

22  Quantum's MRP.  While Arrow has the "sole discretion" to adjust this inventory, this

23  discretion must be reasonably based on the availability of the product and Quantum's

24  MRP.  As such, this provision does not require Arrow to reserve *all* inventory from the

25  pipeline for Quantum, but it is within its discretion to do so if such an action is reasonably

26  based on the MRPs and product availability.

27  Taken together with the Pipeline Provision, the Reserved Inventory Provision does

28  not obligate Quantum to buy some or all of its inventory from its forecast—they merely

14

work together to obligate Arrow to create a pipeline based on Quantum's MRP and maintain reserved inventory for Quantum based on its MRP and product availability.  Both provisions do not *require* Arrow to purchase and hold all products in the MRP but allow it to do so if it is reasonably based on the MRP and product availability.  The Court continues to consider these provisions in light of the entire contract to determine whether Quantum has an obligation to purchase orders held in Arrow's inventory.  *See Walmart Inc.*, 725 F. Supp. 3d at 467.

#### c.    Excess Inventory Provision

Quantum then requests that the Court find that Section 1.4 of the Addendum (the "Excess Inventory Provision") does not create a binding obligation on Quantum, including the obligation to buy the products in every forecast.  ECF 57 at 23.

The Excess Inventory Provision begins with directing Arrow to "report the status of the inventory procured as a result of Customer's MRP" on a periodic basis.  Addendum at 1.  It adds that the action described in Subsection 1.4.1 (the "Freshness Clause") "will be taken"—that "within two weeks of Arrow's written request," Quantum will issue Arrow a Purchase Order for "Inventory aged longer than sixty (60) days."  Addendum at 1.  Subsection 1.4.2 (the purported "Forecast Modification Right") further adds that "Purchase Orders, releases, MRP forecasts, or other electronic requirements for NCNR Parts or Intel Parts may not be cancelled, rescheduled, or modified within thirty (30) days of the initial requested dock date, and such items may not be returned to Arrow for any reason except in accordance with a valid warranty claim."  Addendum at 1.

In the context of the entire Addendum, the term "inventory" in the Freshness Clause refers to the inventory created in the Reserved Inventory Provision because, like in the Freshness Clause, reserved inventory is similarly "procured as a result of [Quantum's] MRP."  Addendum at 1.  As such, the Excess Inventory Provision plainly obligates Quantum to issue Arrow a Purchase order within two weeks of Arrow's written request for reserved inventory aged longer than 60 days.  It does not automatically obligate Quantum to buy every product in the forecast—just the ones that were reserved pursuant to the

1    Reserved Inventory Provision.

2        However, Quantum argues that allowing Arrow to demand purchase orders for

3    inventory aged longer than 60 days regardless of when it was procured would lead to

4    absurd results.  ECF 57 at 24.  In particular, it could make Quantum liable for buying

5    products earlier than it would need, earlier than when it would be able to modify its

6    forecast, and therefore, earlier before the inventory can become "excess."  *Id.* at 25.  Arrow

7    argues that this timeline "belies common sense and the purpose of the parties'

8    relationship."  *Id.*

9        The Court agrees that absurd results should be avoided.  *Rubin v. Baumann*, 52

10   N.Y.S.3d 3, 4 (N.Y. App. Div. 2017).  It does not make sense to require Quantum to buy

11   inventory earlier than when it forecasted its need, especially when that need can change.

12   Further, the Excess Inventory Provision is entitled "Excess Inventory."  Addendum at 1.

13   As such, it would only make sense for the Freshness Clause to be referring specifically to

14   excess inventory, thus requiring Quantum to buy only excess inventory Arrow retained

15   pursuant to the Reserved Inventory Provision.  Doing so would align the clause with the

16   section's title, as well as fix any timeline issues because inventory cannot become excess

17   until after MRPs can no longer be modified, changed, or cancelled.

18       Here, the Forecast Modification Right prohibited Quantum from cancelling,

19   rescheduling, or modifying MRPs within 30 days of the initial requested dock date.

20   Addendum at 1.  While Quantum argues that this applies only to non-cancelable, non-

21   returnable (NCNR) products because of the series-qualifier canon, the Court finds that it

22   also applies to non-NCNR products because it would otherwise lead to an absurd result by

23   allowing Quantum to continually modify its forecasts to avoid having excess products, and

24   therefore, avoid liability when it knows Arrow will demand a purchase order.  ECF 62 at

25   16.  Further, Section 7.1 of the Master Agreement clearly states that "[t]he NCNR

26   designation applies to those Customer purchase order(s)," not MRPs, and thus an MRP

27

28

1  cannot be designated as NCNR.[2]

2      As such, the Court finds that Quantum's obligation to issue a purchase order for

3  excess inventory aged longer than 60 days only accrues after the forecast can no longer

4  change—30 days before the initial dock date.[3]  *See Reape v. New York News, Inc.*, 504

5  N.Y.S.2d 469, 470 (N.Y. App. Div. 1986) ("[W]here a particular interpretation would lead

6  to an absurd result, the courts can reject such a construction in favor of one which would

7  better accord with the reasonable expectations of the parties.").  This timing would allow

8  Arrow to determine that product is "excess" as compared to what was first requested at the

9  initial dock date.  This interpretation would cure any absurd timeline issues, harmonize the

10 provision's content and title, and not require Quantum to buy products earlier than needed.

11     The Court finds that the Excess Inventory Provision, in context of the whole

12 contract, does not transform a forecast into a binding obligation to purchase *all* products

13 within, but it does obligate Quantum to issue a purchase order within two weeks of

14 Arrow's written request for excess inventory that Arrow reserved as per the Reserved

15 Inventory Provision and held for 60 days.  Inventory cannot be determined excessive until

16 30 days before the initial dock date.

17             **d.      Anti-Reliance Provision**

18     Quantum finally argues that the "Anti-Reliance Provision" of Section 8.15 of the

19 Master Agreement is inconsistent with the interpretation that Quantum is liable for

20 products in the forecast.  ECF 57 at 27.

21     The Anti-Reliance Provision states that "[n]either Party can hold the other Party

22

23 [2] Allowing MRPs be equal to customer purchase orders would also go against Quantum's
   argument that MRPs should be treated differently than purchase orders. ECF 57 at 18.
24 Further, Quantum's argument that "Customer obligations" do not refer to MRPs in Section
   7.2 of the Master Agreement goes hand in hand with why the Court finds that customer
25 purchase orders do not include MRPs. *See* ECF 57 at 27 n.11; ECF 66 at 12–13; *supra* n.4.
   [3] Quantum requests a separate ruling form the Court that to the extent any such right to
26 demand purchase orders existed, it could only be exercised 60 days after the date in the
   forecast to which the product estimates in a given forecast were tied, stating that anything
27 short of that would lead to absurd results.  ECF 57 at 25 n.10.  However, the Court finds
   that 30 days before the initial dock date cures these absurd results, as parties can no longer
28 cancel, reschedule, or modify the MRP forecasts pursuant to the Forecast Modification
   Right.

United States District Court
Northern District of California

1    liable for its reliance on the other Party's business plan unless such business plans are

2    incorporated by reference to this Agreement or an Addendum."  Master Agreement at 6.

3         Quantum reasons that because MRPs are "on their face" a business plan and were

4    not incorporated by reference, neither party is permitted to rely on them under the Anti-

5    Reliance Provision.  ECF 57 at 27.  Quantum further explicates that this term cannot be

6    superseded by the Addendum because the Provision applies to any addendum and no term

7    in the Addendum allows Arrow to hold Quantum liable based on Arrow's reliance on

8    forecasts.  ECF 57 at 27.

9         However, as the Court explained, it finds that the Addendum *does* hold Quantum

10   liable based on Arrow's reliance on MRPs—Quantum must issue purchase orders for

11   excessive inventory reserved based on the MRP.  *Supra* Section III.A.2.c.  The Anti-

12   Reliance Provision therefore conflicts with the Excess Inventory Provision, and in

13   accordance with the Agreements, the terms of the Addendum govern.  Master Agreement

14   at 6 (stating that when interpreting the agreement, precedence will be given to the

15   Addendum); Addendum at 1 ("To the extent that there is any conflict between this

16   Addendum and the [Master] Agreement, the terms of this Addendum will govern.").  As

17   such, regardless of whether the MRPs were incorporated, Quantum is still liable for excess

18   inventory within the confines of the Excess Inventory Provision.

19        Ultimately, taking the Addendum and Master Agreement together, the Court finds

20   that Quantum's MRPs by themselves do not constitute a binding purchasing obligations on

21   the part of Quantum and are not purchase orders.  However, it does find that MRPs *can*

22   create a binding purchasing obligation for Quantum: the MRP kickstarts Arrow's

23   obligation to create a pipeline of material by placing orders pursuant to the Pipeline

24   Provision and maintain a reserve pursuant to the Reserved Inventory Provision, and

25   Quantum's purchasing obligation occurs only if Arrow requests a purchase order after

26   receiving and holding excess reserve inventory for 60 days.

27        Accordingly, the Court DENIES summary judgment for Quantum as to finding that

28   forecasts submitted by Quantum do not constitute or create binding purchasing obligations

United States District Court
Northern District of California

18

1    for Quantum.

2        **3.    Forecasts Submitted Before June 4, 2021**

3        Third, Quantum requests the Court find that forecasts submitted before June 4,

4    2021, are not governed by the Addendum.  ECF 57 at 2.

5        Quantum argues that the Addendum did not become "effective" until "the last

6    signature date," which was June 4, 2021.  ECF 57 at 14.  Thus, it reasons that any forecasts

7    submitted before June 4, 2021, are not subject to the Addendum.  ECF 57 at 18 n.4.  Arrow

8    counters that since Quantum signed the Addendum on May 12, 2021, it had already agreed

9    to be bound.  ECF 61 at 7 n.35.

10        "Under New York law, a contract need not be signed by either or both parties in

11   order to be enforceable . . . In the absence of a signed writing, parties can demonstrate the

12   existence of a contractual agreement by making a showing of the 'objective manifestations

13   of the intent of the parties as gathered by their expressed words and deeds.'" *Asesores y*

14   *Consejeros Aconsec CIA, S.A. v. Glob. Emerging Mkts. N. Am., Inc.*, 841 F. Supp. 2d 762,

15   766 (S.D.N.Y. 2012) (citations omitted).  The Second Circuit articulated four factors for a

16   court to consider:  "(1) whether there has been an express reservation of the right not to be

17   bound in the absence of a writing; (2) whether there has been partial performance of the

18   contract; (3) whether all of the terms of the alleged contract have been agreed upon; and

19   (4) whether the agreement at issue is the type of contract that is usually committed to

20   writing."  *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (citations

21   omitted).  It has placed importance on the first factor.  *In re Diocese of Rochester*, 664

22   B.R. 378, 391 (Bankr. W.D.N.Y. 2024).

23        The first *Winston* factor weighs heavily against finding that the contract was formed

24   solely by Quantum's signature.  Here, the Addendum states that it will be "effective as of

25   the last signature date below" and that it will "begin as of" this effective date, which

26   indicates that the parties did not intend to be bound until was last signed.  *See In re*

27   *Diocese of Rochester*, *664 B.R.* at 392.

28        The second *Winston* factor weighs for finding that the contract was formed solely

1    by Quantum's signature. For there to be partial performance, a party must have conferred

2    something of value onto the other party, which they accept. *Rappaport v. Buske*, No. 98

3    CIV. 5255, 2000 WL 1224828, at *7 (S.D.N.Y. Aug. 29, 2000). Here, the partial

4    performance would be Quantum sending Arrow the May Forecast with an email stating

5    "Attached is the forecast for the Arrow supported parts. Please help to get the parts on

6    order so that we can have buffer stock at Arrow," and Arrow ordering products for them

7    based off the May forecast. Goff Decl. ¶ 5 & Ex. 10; ECF 66 at 6. This was more than a

8    mere preparatory act—both satisfied an obligation in the alleged contract. *Rappaport*,

9    2000 WL 1224828, at *7 ("Mere preparatory acts are not partial performance.").

10       The third factor, whether all of the terms of the alleged contract have been agreed

11    upon, weighs in favor of enforcing the contract. The fourth factor, whether the agreement

12    at issue is the type of contract that is usually committed to writing, weighs in favor of not

13    enforcing the contract.

14       Overall, the factors are split on whether the Addendum should be enforced as of

15    May 12, 2021, instead of June 4, 2021. Courts generally apportion the most weight to the

16    first factor, which weighs in favor of nonenforcement. *See In re Diocese of Rochester*, 664

17    *B.R.* at 392 (citing *In re Motors Liquidation Co.*, 580 B.R. at 364). As such, the Court

18    finds that the Addendum should be enforced as of June 4, 2021.

19       Arrow then argues that Quantum's forecast cover email directing it to place orders

20    "estops Quantum from complaining that the orders were premature." ECF 61 at 7 n.35.

21    However, "[w]hen parties do not intend to be bound until their agreement is reduced to

22    writing and signed, there is no contract in the interim even if the parties have orally agreed

23    upon all the terms," and the doctrines of promissory estoppel and part performance are not

24    effective. *Fam. Health Mgmt., LLC v. Rohan Devs., LLC*, 171 N.Y.S.3d 44, 44 (N.Y. App.

25    Div. 2022). This is true even when both parties eventually signed the contract. *Id.* Thus,

26    the Court finds that Arrow's estoppel argument fails.

27       Arrow also argues that the argument is moot because the July Forecast was identical

28    to the May Forecast. ECF 61 at 7 n.35. However, there is a genuine dispute as to whether

United States District Court
Northern District of California

20

the July Forecast would be considered a valid MRP.  Quantum showed evidence from the metadata that brings into doubt who created the July Forecast and when it was transmitted.  ECF 62 at 9.  However, Arrow showed evidence that Quantum employees had seen and referred to the July Forecast.  ECF 64 at 12.  The Court finds that it cannot resolve this argument at this stage, but that it does not affect when the Addendum became effective.  The Court leaves open the issue of how the July Forecast affects damages.

Accordingly, the Court GRANTS summary judgment for Quantum as to finding that the forecasts submitted before June 4, 2021, are not governed by the Addendum.

### 4.    Condition Precedents and Limitations

Fourth, Quantum requests that if Arrow had the right to request purchase orders from Quantum, that the Court find that (1) Arrow needed to provide inventory reports as a condition precedent to that right, and (2) Arrow needed to actually take receipt and physical custody in its warehouse of the parts at issue for at least 60 days.  ECF 57 at 2.

### a.    Condition Precedent

Quantum argues that the Excess Inventory Provision sets out a condition precedent—that Arrow reports the status of the inventory—to its obligation to pay Arrow for excessive inventory.  ECF 57 at 24 n.9.  The relevant parts of the Excess Inventory Provision states that "on a periodic basis, Arrow will report the status of inventory procured as a result of Customer's MRP, and the following actions," including Quantum issuing Arrow a purchase order within two weeks of Arrow's written request, "will be taken."  Addendum at 1.

For a provision to operate as a condition precedent, "it must clearly appear from the agreement itself that the parties intended [to do so]."  *Ashkenazi v. Kent S. Assocs., LLC,* 857 N.Y.S.2d 693, 694 (N.Y. App. Div. 2008) (citing *Kass v. Kass,* 663 N.Y.S.2d 581, 588 (N.Y. App. Div. 1997)).  "While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be expressed in unmistakable language." *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.,* 821 F.3d 297, 305 (2d Cir. 2016) (cleaned up, citations omitted).  Thus, "[i]n determining whether a

1   particular agreement makes an event a condition[,] courts will interpret doubtful language

2   as embodying a promise or constructive condition rather than an express condition." *Id.*

3   (citations omitted).

4        Here, the Court disagrees that the language "plainly indicates" that Arrow reporting

5   inventory status must occur before a demand for a purchase order; it does not find

6   "unmistakable language" supporting that argument. ECF 57 at 24 n.9. The Addendum

7   does not label as the provision as a "condition precedent." *See Bank of New York Mellon*

8   *Tr. Co.*, 821 F.3d at 305. Nor does it employ any recognized "linguistic conventions" of

9   conditions such as if, on condition that, provided that, in the event that, unless and until, or

10  subject to. *Id.* Instead, the connector between inventory status requirement and the

11  purchase requirement is "and," indicating that both obligations must occur, but neither is

12  predicated on the other. *See* Addendum at 1. It is therefore unnecessary for the Court to

13  determine whether Arrow completed the condition precedent.

14       As such, the Court DENIES summary judgment for Quantum as to finding that

15  Arrow needed to provide inventory reports as a condition precedent to that right.

16                      **b.      Limitations**

17       Quantum requests that the Court find two limitations on Arrow's right to request

18  Quantum purchase excess inventory. ECF 57 at 24 n.9.

19       First, Quantum argues that the Freshness Clause unambiguously indicates that a

20  request for a purchase order "must only pertain to inventory that had actually 'aged' sixty

21  (60) days," meaning that Arrow literally needed to have physical custody of the inventory

22  for 60 days before it could make this request. ECF 57 at 24 n.9. Arrow agrees that "only

23  once Arrow orders and receives and holds for 60 days the components Quantum forecasted

24  may Arrow issue a demand for purchase." ECF 61 at 7. Thus, the Court agrees that

25  Arrow must have had physical custody over the parts at issue for sixty days.

26       Second, Quantum argues that the Arrow must have given the written request in a

27  commercially reasonable timeframe. ECF 57 at 24 n.9. Arrow does not dispute this. *See*

28  ECF 61 at 9 n.43, 13. Because the U.C.C.'s gap filling provision applies here, a

"reasonable time" is supplied where there is no specific timing.  *See supra* Section III.A.2.a.i.; *City Calibration Ctrs. Inc.*, 727 F. Supp. 3d at 356.  Thus, the Court agrees that the written request must be exercised in a commercially reasonable timeframe.

As such, the Court GRANTS summary judgment for Quantum as to the two limitations of Arrow's right to request Quantum purchase excess inventory: that Arrow must have had physical custody over the parts at issue for 60 days, and that the right needed to have been exercised in a commercially reasonable timeframe.

### 5.    Redundancy of Arrow's First and Second Claims for Breach

Fifth, Quantum requests partial summary judgment that Arrow's Second Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing is redundant of, and subsumed by, Arrow's First Claim for Breach of Contract.  ECF 57 at 2.

"Claims for breach of good faith and fair dealing are not duplicative when claims are not predicated on contractual terms that form the basis of the breach of contract claim." *Danusiar v. Auditchain USA, Inc.*, No. 20-CV-1477, 2020 WL 6126378, at *9 (S.D.N.Y. Oct. 8, 2020) (citing *Forman v. Guardian Life Ins. Co. of America*, 76 A.D.3d 886, 908 N.Y.S.2d 27 (1st Dept. Sept. 21, 2010)).  Thus, to survive, a claim for violation of the covenant must be based on allegations different from those underlying the breach of contract claim, and the relief sought must not be intrinsically tied to the damages that flow from the breach of contract.  *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022).

Here, Arrow argues that the claims are not redundant because they deal with two separate harms from separate obligations—the breach of duty by Quantum to purchase excess inventory and the breach of duty by Quantum to forecast in good faith and reasonably.  ECF 76 at 37.  Thus, Arrow reasons, the second claim relies on different facts than the first claim because it is "borne out by Quantum's sporadic, zigzagging forecasts." ECF 61 at 14; *cf.* ECF 57 at 28 (Quantum stating that both claims are predicated on the same conduct of Arrow purchasing product based on Quantum's forecasts, and Quantum thereafter failing to purchase the product).  While a breach of implied covenant claim can

23

be deemed not duplicative of the breach of contract claim if it relies on different facts despite the overlap in facts alleged, it still must seek damages different from the contract claim. *Tiffany & Co. v. Lloyd's of London Syndicates 33, 510, 609, 780, 1084, 1225, 1414, 1686, 1861, 1969, 2001, 2012, 2232, 2488, 2987, 3000, 3623, 4444, 4472, & 4711*, 211 N.Y.S.3d 894, 894 (N.Y. Sup. Ct. 2024). Arrow has not shown that they are seeking damages different from the breach of contract claim for its breach of implied covenant of good faith and fear dealing.

On both causes of action, Arrow seeks $4,623,479.69 for unpurchased product, additional damages, attorneys' fees, and prejudgment and post-judgment interest. ECF 1 at 8. While Arrow states that the relief for both "would not be a perfect one-to-one match," the relief from the breach of implied covenant of good faith and fair dealing is still intrinsically tied to the damages that flow from the breach of contract—both damages are the consequence of Quantum not issuing purchase orders and paying for excessive inventory. ECF 76 at 39; *Tiffany & Co.*, 211 N.Y.S.3d at 894 (finding that the breach of implied covenant of good faith is redundant when its damages are a direct result of the breach of contract damages). This is true regardless of whether the MRPs Arrow used to procure said inventory were made in bad faith. Thus, Arrow's second claim of implied covenant of good faith and fair dealing is duplicative of its first claim of breach of contract. *See Tiffany & Co.*, 211 N.Y.S.3d at 894 (finding the breach of the implied covenant of good faith and fair dealing duplicative when it seeks the same categories and types of damages as the breach of contract).

As such, the Court GRANTS summary judgment for Quantum as to finding that Arrow's Second Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing is redundant of, and subsumed by, Arrow's First Claim for Breach of Contract.

### B.    Arrow's Motion for Summary Judgment

Arrow seeks a summary judgment finding that Quantum is liable for $4,029,413.20 because Arrow has sole discretion in procurement decisions and used a reasonable lead time. ECF 81 at 11. In the alternative, Arrow seeks summary judgment that Quantum is

United States District Court
Northern District of California

1    liable for at least $3,719,807.21 because Arrow informed Quantum of its 18-week lead

2    time of Quantum's forecasted demand.  ECF 81 at 11.

3         **1.    Clear and Unambiguous Obligations Arising from the Addendum**

4         Both parties agree that the contract is "unambiguous" and therefore that the "plain

5    language of the Master Agreement and Addendum controls this dispute."  ECF 81 at 11;

6    ECF 61 at 10.  Because the Court finds that there is no reasonable basis for a difference of

7    opinion in the contract, the Court agrees.  *See JA Apparel Corp. v. Abboud*, 568 F.3d 390,

8    396 (2d Cir. 2009) (citations omitted).  However, as explained in Section III.A.1., the

9    Court can consider course of performance, course of dealing, or usage of trade within the

10   confines of N.Y. U.C.C. 2-202.

11        **a.    Arrow's Obligations**

12        As discussed earlier, the plain language of the Pipeline Provision obligates Arrow to

13   create a pipeline based on MRPs by placing orders with product manufacturers.  *Supra*

14   Section III.A.2.a.  The pipeline must be reasonably based on the MRP and completed by a

15   reasonable time based on "an extrinsic event, commercial practice, or trade usage.  *Id.*

16        Further, the plain language of the Reserved Inventory Provision grants Arrow the

17   "sole discretion" to build, maintain, and adjust the inventory held for Quantum.  However,

18   despite its discretion, Arrow is still constrained by the MRP, availability of product, and

19   reasonableness of industry standards.  *Supra* Section III.A.2.b.

20        Arrow alleges that it performed its obligations under the Addendum and Master

21   Agreement in procuring the forecasted components, prompting Quantum's obligations.

22   ECF 81 at 12.  The Court explores this in Section III.B.2.a.

23        **b.    Quantum's Obligations**

24        Further, as discussed earlier, the Excess Inventory Provision plainly obligates

25   Quantum to purchase components that Arrow reserved according to the Reserved

26   Inventory Provision within two weeks of Arrow's request.  *Supra* Section III.A.2.c.  These

27   components must have been deemed excessive after Arrow held them for 60 days.  *Id.*

28        Arrow alleges that Quantum failed to perform its obligations by refusing to issue

United States District Court
Northern District of California

1    purchase orders and pay for the aged inventory, resulting in $4,029,413.20 of damages,

2    which the Court will explores in the next section.

3         **2.    Damages Amount**

4              **a.    Reasonableness of Arrow's Lead Times**

5         Arrow argues that there is no genuine, material factual disputes to challenge the

6    propriety of Arrow's lead times, and thus, the amount of damages.  ECF 54-2 at 15.

7    However, Quantum states that Arrow calculated damages based on the wrong lead times.

8    ECF 62 at 23.

9              **i.    Industry Standards and Quantum's Lead Times**

10        Arrow first states that it placed orders based on its calculated lead times, consistent

11   with industry standards and comparable to Quantum's own recorded lead times.  ECF 81 at

12   15.

13        Arrow states that it placed orders to satisfy Quantum's forecasts based on lead times

14   that factored in the expanding supplier lead times, the suppliers' historical performance

15   against lead times, the tight market amid the pandemic, the direction from Quantum to

16   build up buffer inventory, and the Addendum requirement that Arrow maintain a reserved

17   inventory for Quantum.  ECF 81 at 15.  However, Arrow uses stricken expert testimony to

18   support that its ordering practices, including its lead times were well within industry

19   standard practices.  *Id.*; ECF 80.  Thus, there are no facts to support this contention.

20        Arrow also states that Quantum's own system contained nearly identical lead times.

21   ECF 81 at 15.  While this is true for some products, other products have different lead

22   times between the two companies.  *Compare* ECF 81 at Table 1, with Willis Decl. Ex. 44

23   (comparing the lead times between the two companies for HDEBL32GEA51 and

24   HDEBL21GEB51).  The Court finds that the distinction between different lead times

25   between the two companies can affect whether the lead times are reasonable, and in turn,

26   can affect the damages and what Quantum is liable for.

27        The Court cannot find at this junction that Arrow's lead times were within industry

28   standards or that they were reasonable as compared to Quantum's own lead times.

United States District Court
Northern District of California

### ii.    Quantum's Knowledge

Arrow then states that if the Court were unable to find that all of its lead times were reasonable, it seeks summary judgment for damages of $3,719,817.21—a subset of inventory where Arrow ordered within a known 18-week lead time.  ECF 81 at 16.

Arrow argues that because it told Quantum it would need to place hard orders with manufacturers at least 18 weeks out to ensure it could meet Quantum's forecasted requirements and subsequently placed all but 892 orders within this 18-week lead time, Quantum is responsible for products following this timeline.  ECF 81 at 16.  However, as Quantum points out, Goff's May 26, 2021, email refers to a "16 weeks lead time," not 18.  ECF 62 at 23 (citing Goff Decl. Ex. 9 at 1).  Arrow also points to Goff's statement to Timmons that "we should be booking hard orders now for all demand through 9/30/21," which was 18 weeks from the date of the email.  ECF 64 at 16.

Based on these facts, a factfinder could find that an 18-week lead time was unreasonable, and thus, there is a genuine dispute of material fact.  An 18-week lead time may have been reasonable when Arrow informed Quantum on May 26, 2021, but Arrow continued to place orders until 6 months later in December 2021, during which the market and reasonable lead times could have changed to make an 18-week lead time no longer reasonable.

As such, the Court finds that there is a genuine dispute of material fact as to whether all of Arrow's lead times—including its 18-week lead times throughout its entire ordering timeline—were reasonable, and therefore, whether Arrow properly performed its obligations.  Because this affects the damages amount, the Court DENIES summary judgment for Arrow as to both $4,029,413.20 of damages and $3,719,817.21 of damages.

### b.    Products Cancelled With at Least 30 Days Lead Time

Quantum argues that no damages should be awarded for products it cancelled with at least 30 days lead time under the Forecast Modification Right.  ECF 62 at 22.  Thus, it reasons, Arrow should not be entitled to any damages for products it ordered with a dock date after September 18, 2021, 30 days after Quantum issued its August Forecast.  ECF 62

at 22.

Arrow first contends that the August Forecast does not qualify as an MRP because it does not comport with the mutually agreed electronic format required by the Addendum and is instead a chart pasted in an email.  ECF 64 at 12.  Arrow did not cite to this "chart pasted in an email."  Using Quantum's cite of the August Forecast, this email is going from Arrow to John Lauritano, a manufacturer representative.  Hammon Decl. Ex. G.  Thus, while it is true that the email shows a chart pasted in an email, the Court cannot determine if this was the original format that Quantum sent to Arrow since this email was not the original communication, but rather Arrow forwarding the forecast to a third party.  *Id.*  Further, Arrow states that Quantum's Director of Supply Chain stated that he "ha[d] not seen" a forecast between July and September and was not familiar with anybody who has, in direct contradiction of Quantum's evidence that showed Quantum had received an updated forecast.  ECF 64 at 12; ECF 62 at 23.  As such, there is a genuine issue of material fact as to whether the August Forecast was an MRP under the Addendum.

Even if the August Forecast was a valid MRP, Quantum may still be liable for products that Arrow ordered with a dock date after September 18, 2021.  If Arrow already properly ordered and reserved these products under the Pipeline Provision and Reserved Inventory Provision, they became excess inventory due to the reduced August Forecast, and Arrow held them for 60 days, Arrow has the right to demand a purchase order from Quantum for those products under the Excess Inventory Provision.  Further, it still stands that Section 7.2 of the Master Agreement holds that "no Order . . . may be cancelled, rescheduled, reconfigured, or assigned without the Parties' prior written agreement" and if they do, Quantum "may be liable to Arrow for any additional costs and expenses incurred by Arrow."[4]  Master Agreement at 3.  Thus, if Arrow already made an order, it cannot be

---

[4] Section 7.2 only applies to orders and customer obligations.  It does not apply to MRPs because the Court finds that they do not fall under customer obligations.  A forecast does not obligate the customer to do anything and is not an order.  While Quantum will send an MRP, it does not make sense that forecasts can only be cancelled, rescheduled, reconfigured, or assigned with the parties' prior written agreement—this defeats the purpose of a forecast.

1    cancelled or reconfigured, and if it did, Quantum would potentially bear the cost.  If,

2    however, the October Forecast was valid, Quantum would not be liable for any products

3    Arrow had not yet placed orders for.

4                    **c.    Connecting Products to Specific Forecasts**

5            Quantum argues that Arrow's claims of damages fails because Arrow has not

6    adequately established that each product ordered during the relevant time period was

7    linked to particular Forecasts or Purchase Orders and instead relies on the assumption that

8    each Product listed in Table 3 was purchased pursuant to Quantum's Forecasts.  ECF 62 at

9    24.  Quantum states that Arrow provided no evidence to link individual units of each

10   product to particular forecasts, and instead, the evidence shown by Jeffrey Wexler shows

11   that Arrow's orders in July, August, and September 2021 consistently exceeded the total

12   number of units identified in the May 2021 Forecast.  ECF 62 at 24 (citing Wexler Decl. ¶

13   8, Ex. A).  Arrow states that the Court should strike Quantum's Declaration of Jeffrey

14   Wexler because he does not have the expertise or factual foundation to support his

15   conclusions—Wexler is an outside counsel that does not have personal knowledge or

16   specialized knowledge.  ECF 64 at 13.

17           Declarations by attorneys are only sufficient if the facts stated are matters of which

18   the attorney has personal knowledge such as matters connected with the course of the

19   lawsuit.  *Express, LLC v. Fetish Grp., Inc.*, 464 F. Supp. 2d 965, 974 (C.D. Cal. 2006).

20   Statements that the declarant had personal knowledge and was familiar with the facts,

21   alone, is not sufficient to establish personal knowledge—there must be a sufficient

22   foundation to establish how the attorney has personal knowledge about Arrow's deliveries

23   by month.  *Id*. at 977.  Personal knowledge is not strictly limited to activities in which the

24   declarant has personally participated—it can come from review of contents of files and

25   records.  *Washington Cent. R. Co v. Nat'l Mediation Bd.*, 830 F. Supp. 1343, 1353 (E.D.

26   Wash. 1993).

27           Wexler stated that he made the declaration "upon [his] own personal knowledge"

28   and would be able to "testify competently."  Wexler Decl. ¶ 1.  Further, his role as counsel

United States District Court
Northern District of California

United States District Court
Northern District of California

1    of record for Quantum and participation in litigation gives him personal knowledge of

2    facts from reviewing records for the case and forming his own perception of them.  *Id.*;

3    ECF 84 ¶ 2; *see Barrowman v. Wright Med. Tech. Inc.*, No. C15-0717, 2017 WL 4161688,

4    at *2 (W.D. Wash. Sept. 19, 2017) (stating that personal knowledge may be inferred from

5    the declarant's role and participation in the matter declared).  Thus, from reviewing

6    records, Wexler can "testify to acts that . . . he did not personally observe but which are

7    described in the record."  *Id*.

8         Thus, the Court does not strike Wexler's declaration and finds that Quantum has

9    properly raised a genuine issue of material fact.

10                         **d.    Mitigation**

11        Arrow stated that there was no genuine issue of material fact that it appropriately

12   sought to mitigate its damages.  ECF 64 at 14.  It contacted suppliers requesting return or

13   cancellation in October through November 2021.  Willis Decl. Ex. 50.  It also searched its

14   customer database for other potential buyers, posted the inventory for sale on its public

15   website, and used its broker affiliate to seek buyers.  ECF 81 at 8.  Additionally, Cheri

16   Sanchez, Arrow's technical sales engineer, stated that efforts to move inventory began in

17   early 2022 because that was when she had the sense that Quantum would stop taking

18   product.  Sanchez Dep. 60:20–60:25.

19        Quantum counters that because Arrow did not make efforts to sell excess product it

20   had purchased until March 2022, more than 6 months after Arrow knew that Quantum cut

21   its forecasted demand on August 19, 2021, efforts to mitigate were halfhearted.  ECF 62 at

22   24.  Quantum also provides evidence that Arrow refused to get rid of some inventory

23   because the price was not high enough.  Hammon Decl. Ex. K.

24        Quantum has raised a genuine issue of material fact, particularly concerning the

25   timing of when Arrow began to sell excess product and what is an appropriate price to

26   accept to reasonably mitigate.

27        Because there is a genuine issue of material fact regarding reasonable lead times,

28   product cancellation, linkage between products and forecasts, and reasonable mitigation

efforts, the Court DENIES summary judgment for Arrow as to both its requests for $4,029,413.20 in damages and $3,719,807.21 in damages.

## IV.    CONCLUSION

Accordingly, the Court GRANTS in part Quantum's motion for partial summary judgment as to finding that (3) the forecasts submitted before June 4, 2021, were not governed by the Addendum; (4)(b) Arrow was required to take receipt and have physical custody in its warehouse of the parts at issue for at least 60 days before it had the right to request purchase orders from Quantum under the Addendum; and (5) Arrow's Second Claim for Breach of Implied Covenant of Good Faith and Fair Dealing is redundant of, and subsumed by, Arrow's First Claim for Relief for Breach of Contract, and DENIES in part Quantum's motion for partial summary as to finding that (1) the Court cannot consider extrinsic evidence for purposes of interpreting Arrow's form agreements unless Arrow identifies specific provisions in the agreements it drafted that it contends are ambiguous; (2) forecasts submitted by Quantum do not constitute or create binding purchasing obligation on the part of Quantum; and (4)(a) Arrow was required to satisfy its obligation to provide inventory reports as a condition precedent before it had the right to request purchase orders from Quantum under the Addendum.  Additionally, the Court DENIES Arrow's motion for summary judgment that Quantum breached the parties' contract and Arrow is damaged in the amount of $4,029,413.20, or alternatively, $3,719,807.21, as well as reasonable attorneys' fees, costs, and interest.

The claim to be tried is Arrow's first claim for breach of contract.

**IT IS SO ORDERED.**

Dated:  January 21, 2025                      _____

                                              NATHANAEL M. COUSINS
                                              United States Magistrate Judge